UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

LISA SIVERS,
on behalf of D.S.

                                  Plaintiff,

       v.                                          3:04-CV-1142
                                                 (LEK/GJD)

COMMISSIONER OF SOCIAL
SECURITY,

                                 Defendant.

_____

LISA SIVERS, Plaintiff *Pro Se*
WILLIAM H. PEASE, Asst. U.S. Attorney for Defendant

GUSTAVE J. DIBIANCO, Magistrate Judge

### REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable

Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d).

### PROCEDURAL HISTORY

Plaintiff Lisa Sivers filed an application for Supplemental Security Income

(SSI) benefits on behalf of her infant child, who will be referred to as "D.S."  There

appear to be two applications for SSI benefits in the record,[1] however, the

Administrative Law Judge's (ALJ) decision and the Commissioner's memorandum of

---

[1] The first application contained a "protective" filing date of October 1, 2001.  Both applications allege the same onset date of October 1, 2001.  The two applications appear back to back in the record. (T. 47-51, 52-55).  It is clear that the Commissioner considers the second application to be the application that is the subject of this action.  Since the applications were filed only months apart and allege the same onset date, the date of filing is not relevant to the decision in this case.

law refer to the application filed with a "protective"[2] filing date of March 22, 2002. (T. 52-55).

Plaintiff's application was denied initially and a request was made for a hearing. A hearing was held before an ALJ on March 10, 2004. (T. 274-292). In a decision dated March 31, 2004, the ALJ found that D.S. was not eligible to receive child's SSI benefits. (T. 12-18). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on July 29, 2004. (T. 4-6).

## CONTENTIONS

The plaintiff, who is *pro se*, makes the following claims in two submissions to the court which have been sealed at plaintiff's request. (Dkt. No. 15, 20). Although plaintiff has requested that these submissions be sealed, there is nothing confidential about the submissions as will be explained in a description of plaintiff's contentions.

Docket Number 15 contains copies of prescriptions written by Dr. Azmat Saeed, D.S.'s treating physician. Also included is a letter brief by the plaintiff explaining her grounds for the appeal, information about plaintiff's other children, and a letter dated August 4, 2005 from D.S.'s teacher. In her letter brief, plaintiff makes the following arguments.

(1) The Commissioner was incorrect in denying SSI benefits to D.S.

(2) A September 23, 2005 psychiatric evaluation obtained by plaintiff shows that D.S. is eligible for SSI payments.

---

[2] Pursuant to the Social Security regulations, an application may be protectively filed when an individual, or a person on his behalf, contacts the Social Security Office by telephone and then subsequently files a written application. *See* 20 C.F.R. § 416.345.

(3) Plaintiff's letter from D.S.'s teacher dated August 4, 2005 shows that D.S. is eligible for SSI benefits.

(4) Dr. Saeed's notes and the prescriptions written by Dr. Saeed confirm D.S.'s diagnosis of ADHD, which make D.S. eligible for SSI benefits.

Plaintiff requests that the court issue a subpoena for the report of the psychologist from Industrial Medicine Associates who performed the psychiatric evaluation.  Without ruling on the propriety of requesting this court to issue a subpoena, that request is *now moot*.  Plaintiff has obtained a copy of that psychiatric evaluation and submitted it to this court on January 20, 2006.  It is filed as Docket Number 20.

Defendant argues that the Commissioner's determination is supported by substantial evidence and must be affirmed.

## FACTS

1.   __Non-Medical Evidence and Testimony:__

Plaintiff D.S. is a young child who was six years old at the time of the ALJ hearing in March, 2004.  (T. 280).  D.S. has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), and has been treated by Dr. Azmat Saeed since D.S. was nine months old or younger.  (T. 57-73).  D.S. attends regular schools and does not receive any special services beyond his kindergarten class instruction.  (T. 280).  At the hearing, Lisa Sivers stated that D.S. has an additional impairment known as "sensory integrative disorder." (T. 281).  It is unclear whether this is a separate disorder or part of D.S.'s ADHD since none of the medical records contain a diagnosis of this disorder.  Lisa Sivers stated that she has not been able to find anyone to treat this disorder. (T. 281).

D.S. is presently taking two medications prescribed by Dr. Saeed, and is attending school without any special educational programs or special assistance.  (T. 281, 286).  Lisa Sivers stated that D.S. is very impulsive and hyperactive, including constantly fighting with his brothers.  (T. 283-287).  Nevertheless, she testified that D.S. has the ability to be a "very good child" (T. 285) and that D.S.'s present teacher states that he is progressing but D.S. is concerned about what his next activity will be (T. 287).

At the hearing, the ALJ carefully explained to plaintiff that she had a right to representation and confirmed that she had received a written notice of that right to representation when she received the hearing notice. (T. 276, 277).  The ALJ also made sure that plaintiff understood her rights. (T. 276, 277).  Ms. Sivers elected to proceed without representation. (T. 277).  The ALJ also encouraged Ms. Sivers twice to tell the ALJ everything that she wanted to say about D.S. (T. 277, 288).  During the hearing, the ALJ asked plaintiff whether she reviewed all the proposed exhibits.  She responded that she would like additional time to review those exhibits, and the ALJ promptly allowed her additional time to review the proposed exhibits. (T. 278, 279).

At the hearing, and in her letter brief, (Dkt. No. 15), Ms. Sivers contended that since her other two children are receiving SSI benefits and have medical diagnoses and behavior similar to D.S., he should also be eligible for SSI benefits. (T. 288, Dkt. No. 15).  Ms. Sivers did state that there is one significant difference between the testing of D.S. and one of her other sons.  That difference was that D.S. was taking medications and that her other son was not taking medication at the time of the testing. (T. 289).

The teacher's letter submitted with Docket Number 15 is dated August 4, 2005,

and states in part that "[a]lthough he [D.S.] made good progress in all academic areas throughout the year, there were times when his impulsive behavior interfered with his work and his interactions with others." D.S.'s teacher also states in the letter that there were days when D.S.'s behavior caused disruption in the classroom. The teacher concluded that "[h]is medication . . . definitely helped to control some of his impulsiveness."

Ms. Sivers has also submitted eight pages of records from the Binghamton Psychiatric Center which are already in the Administrative Transcript. (T. 106-113). These records concern an admission for "medication" and "individual therapy" (T. 113) during January of 2002. (T. 106).

## 2.    Medical Evidence:

The record contains extensive notes about office visits by D.S. to Dr. Azmat Saeed between April of 2001 and May of 2002. (T. 57-73). Dr. Saeed's notes show that Dr. Saeed treated D.S. for many very ordinary ailments such as upper respiratory infections, injuries to fingers, and other routine occurrences. (T. 57-73). Dr. Saeed stated that D.S. was a "healthy boy." (T. 70). According to plaintiff, she takes D.S. to Dr. Saeed approximately every three months unless there is some reason to go more frequently. (T. 281). Dr. Saeed prescribes Risperdal and Concerta for D.S. (T. 281).

D.S. has been treated by the Binghamton Psychiatric Center (T. 145-179), and has also been examined by the Broome County Developmental Service. (T. 74-89). The records of the Binghamton Psychiatric Center show that D.S. has been diagnosed with Attention Deficit and Hyperactivity Disorder (ADHD), (T. 147). However, after using medication, D.S.'s behavior improved, he was "much calmer" at home and school (T. 153), and was doing "fairly well at home and school." (T. 157, 161, 164,

5

169).  A psychiatrist from the Binghamton Psychiatric Center stated that D.S. was alert, cooperative, had improved academically and had started to show good interest in school. (T. 179).  A social worker at the Binghamton Psychiatric Center made extensive notes showing D.S.'s progress. (T. 115-119, 161-177).  Many of these notes state that D.S. was doing "fairly well," and one note indicates that plaintiff told the social worker that D.S. was doing "pretty well." (T. 164, 169).

D.S. was also examined by many medical specialists of the Broome County Developmental Service, using a "multi-disciplinary approach". (T. 74-86).  The initial examinations of D.S. during September of 2001 show that he was very cooperative, but did demonstrate low average fine motor skills, and eye-hand coordination. (T. 74, 75).  D.S. was tested, and his full scale IQ was 101 with a performance IQ of 89, and a verbal IQ of 112. (T. 80).  Other notes indicate that D.S. had average cognitive skills (T. 84), but might have some delays in sensory processing. (T. 94).  During a visit to the Binghamton Psychiatric Center during late 2000, plaintiff complained of D.S.'s hyperactivity, restlessness, impulsivity, and aggressiveness. (T. 100).  Testing at that time showed that D.S. had an average IQ. (T. 100).

One psychiatric evaluation showed that although *plaintiff* had alleged that D.S. exhibited the symptoms stated above, and at the examination D.S. did exhibit hyperactive behavior, D.S. had normal speech, was alert, cooperative, and had logical, coherent thoughts. (T. 109).  Physicians at Binghamton Psychiatric Center recommended that D.S. use medication and attend therapy.  (T. 114).

The record contains notes from D.S.'s teachers, who completed forms for the New York State Disability Agency and the ALJ. (T. 129-132, 142-144).  A May 2002 note from teacher Diana Robertson states that there have been no problems with

D.S.'s speech or communication, (T. 131, 132), and that D.S. functions at an "age-appropriate manner in all areas of development." (T. 132).  The other questionnaire sent by the ALJ on January 6, 2004 also states that D.S. exhibits "age-appropriate skills and ability with respect to thinking and use of language." (T. 142).  The teacher responded that D.S. can be defiant, unsafe, and impulsive, but generally follows school rules. (T. 143).  The teacher ended by stating that D.S. "presently shows little hyperactivity, but had shown more hyperactivity earlier in the school year." (T. 144).

Notes from a physical therapist who treated D.S. between February and April of 2002 state that D.S. showed a "marked improvement" since utilizing the medication Adderall. (T. 125).  This was confirmed by D.S.'s parents. (T. 125).  The therapist also stated that D.S.'s ability to focus on tasks and perform fine motor activities had increased. (T. 125).  The record shows that *plaintiff* told the therapist that D.S.'s medication was working well for him. (T. 126).  The notes show that D.S. was showing "large improvements in his turn taking ability and respect for others ..." (T. 126), and that he continued to make progress in learning skills while he was on his medication. (T. 127).

At about the same time that the notes regarding improvement were made by the physical therapist, plaintiff completed a form for New York State on April 22, 2002, stating that D.S. was extremely hyperactive, obsessive, would not wait his turn, and was very aggressive. (T. 265-266).  The information given by plaintiff on this form on April 22, 2002 appears to be completely inconsistent with the detailed notes of the physical therapist during that same time period. (T. 125-127).

Physicians completed Childhood Disability Evaluation Forms on November 15, 2001, (T. 94-99), and May of 2002 (T. 134-39).  Both physicians found that D.S. did

not medically equal any listings in the Social Security Regulations, and found that he did not have sufficient deficits in the various domains to functionally equal the severity of any listed impairment.  (T. 94-99, 134-39).  The November 2001 evaluation by Dr. Quinto showed that D.S. had no limitations in one domain, and "less than marked" limitations in five of the six domains. (T. 96).  The 2002 evaluation by Dr. Randall showed that D.S. had "no limitations" in three of the domains of function, and "less than marked" ratings in three of the domains.

## DISCUSSION

### 1.   Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  A court's factual review of the Commissioner's final  decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be

"more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

**2.      Standard for Children's SSI Benefits**

Congress amended the definition of childhood disability in 1996. *See* PRWORA,[3] Pub. L. No. 104-193, § 211(d)(1)(A)(ii), 110 Stat. 2105 (codified at 42 U.S.C. § 1382c).  Prior to 1996, a child was entitled to SSI disability benefits if he or she suffered from a "medically determinable physical or mental impairment of comparable severity" to that which would disable an adult. *See* 42 U.S.C. § 1382c(a)(3)(A) (1994).

The PRWORA replaced this "comparable severity" standard with one that focuses on whether a child has "marked and severe" limitations. 42 U.S.C. § 1382c.

---

[3] Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub. L. No. 104-193, § 211(d)(1)(A)(ii), 110 Stat. 2105 (codified at 42 U.S.C. § 1382c).

This standard involves a three-step analysis. 20 C.F.R. § 416.924(a).  The first question is whether the child is engaged in substantial gainful activity.  20 C.F.R. § 416.924(b).  If not, then the second inquiry is whether the child has a severe impairment.  *Id.* § 416.924(c).  A "severe" impairment is one that is more than a "slight abnormality." *Id.*  If the child's impairment is severe, then the third question is whether the impairment meets or is medically or functionally equal in severity to a disability listed in the Listing of Impairments.  *See* 20 C.F.R. § 416.924(c)(citing 20 C.F.R. Part 404, Subpt. P, App. 1 ("the Listings")).  If all three of the above requirements are met, and the child's disability has met the twelve month durational requirement,[4] then the child will be considered disabled for purposes of SSI disability benefits.  20 C.F.R. § 416.924(d).

An impairment "meets" the severity of a listed impairment if the "medical findings are at least equal in severity and duration to the listed findings."  20 C.F.R. § 416.926(a).  If the impairment is not listed or medically equivalent to a listed impairment, then "functional equivalence" must be examined.  An impairment is "functionally equivalent" if the impairment(s) are of  listing-level severity. 20 C.F.R. § 416.926a (a).  An impairment meets listing-level severity if the impairment results in "'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain . . . ." *Id.*  The six domains considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) the child's ability to care for him/herself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(g)-(l).

---

[4]  20 C.F.R. §§ 416.909, 416.924(d)(1) (2003).

The regulations state that a child has a "marked" limitation in a domain when the child's impairment(s) interferes seriously with his or her ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).  A "marked" limitation is also described by the regulations as more than moderate but less than extreme and is the equivalent of the functioning expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.*

A finding of an "extreme" limitation is warranted when the child's impairment(s) interferes *very* seriously with his or her ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation is also described by the regulations as "more than marked" and the rating "given to the worst limitations." *Id.*  The court does note that although a rating of "extreme" may be given, it does not necessarily mean a total lack or loss of ability to function.  20 C.F.R. § 416.926a(e)(3)(i).  The "extreme" rating is the equivalent of the functioning expected on standardized testing with scores that are at least three standard deviations below the mean.  *Id.*

3.   **The ALJ's Decision**

In this case, although the ALJ found that plaintiff had severe impairments, the ALJ found that D.S.'s impairments did not meet or equal the clinical requirements of a listed impairment. (T. 14).  D.S. has been diagnosed with ADHD and asthma. Although plaintiff claims that plaintiff has an the additional impairment of "sensory integrative disorder," there are no medical reports that actually diagnose this disorder. The ALJ chose two listings against which he compared D.S.'s symptoms. (T. 14).  The listing for ADHD is section 112.11, and this listing requires that the child have

11

"marked" inattention, impulsiveness, and hyperactivity as well as at least two of the criteria listed in section 112.02(B)(2), which include "marked" impairments in age appropriate cognitive/communicative function; social functioning; personal functioning; or difficulties in maintaining concentration, persistence, or pace. 20 C.F.R. Part 404, Subpt. P, App.1, § 112.11.

The ALJ found that D.S. did not meet the first requirement of this listing because he did not exhibit "marked" inattention, impulsiveness, and hyperactivity. (T. 14). Thus, the ALJ did not proceed to consider the criteria listed in section 112.02. The ALJ also found that D.S.'s asthma did not meet the severity of the listing for asthma at section 103.03. (T. 14).

After the ALJ found that D.S.'s impairments did not clinically meet or equal the severity of a listed impairment, the ALJ then analyzed whether D.S.'s impairments were "functionally equal" to a listed impairment. (T. 14-17).  The ALJ reviewed every domain separately in determining that D.S. did not have either one extreme limitation or two marked limitations as would be required to find functional equivalence. (T. 16-17).

## 4.    New and Material Evidence

Plaintiff has submitted additional evidence that she believes support her claim on behalf of D.S.  The evidence that plaintiff is attempting to submit post-dates both the plaintiff's alleged onset date of October 1, 2001 and the Appeals Council's decision dated July 29, 2004.  Thus, none of this evidence was submitted to the agency for its review.

When a plaintiff presents evidence to the District Court that has not been presented to the Commissioner, the court cannot simply consider the evidence.  The

Social Security Act provides that a court may only ***remand*** for the Commissioner to consider new evidence. 42 U.S.C. § 405(g)(sentence six).  However, in order to justify a remand, the court must find that the evidence was "new and material."

The Second Circuit has developed a three-part showing that is required to support a sentence six remand for "new and material evidence" pursuant to section 405(g). *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988).  First, the evidence must be "new" and not merely cumulative of what is already in the record. *Id.* (citing *Szubak v. Secretary of Health & Human Services*, 745 F.2d 831, 833 (3d Cir. 1984)).

Second, in order for the new evidence to be "material," it must be ***both relevant to the claimant's condition during the time period for which benefits were denied and probative.*** *Id.* (citing *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975)). The Second Circuit has also held that the concept of "materiality" requires a finding that there is a reasonable possibility that the new evidence would have influenced the Commissioner to decide the claimant's application differently. *See Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991).  Finally, the plaintiff must show that there is good cause for failing to present the evidence earlier. *Lisa v. Secretary of the Dep't of Health & Human Services*, 940 F.2d 40, 43 (2d Cir. 1991)(quoting *Tirado*, 842 F.2d at 597).

The plaintiff's January of 2006 submission (Dkt. No. 20) is a psychiatric evaluation of D.S. by the Industrial Medicine Associates, dated September 23, 2005. The report is clearly "new" since it was not in existence at the time of the agency decision.  The examination was conducted by a licensed psychologist, and contains many statements derived from plaintiff's statements about her son's behavior. Dkt. No. 20 at p.2.  The report, however, does not indicate that it relates to any previous

time, and is the report of a single examination.  Although the fact that the report was written after the relevant time period does not necessarily mean that it does not relate to the relevant time period,[5] in this case, the court finds that the report is not sufficiently "material."

The court would point out that the report does not indicate that plaintiff has "marked" or "extreme" limitations in any of the domains stated above.  Although the report indicates that attention and concentration were "impaired", there is no indication of the severity of the impairment in relation to the requirements of the regulations.  The fact that D.S. has been diagnosed with ADHD or any other disorder is not sufficient to show that his impairments meet or are functionally equal to a listed impairment.  The psychologist concludes that D.S. has "difficulty" with various functions, but "difficulty" does not necessarily signify a "marked" or "extreme" limitation.  Thus, this court finds that this report is not "material" sufficient to be considered "new and material" evidence to support a remand for its consideration.

The other evidence presented includes proof that D.S.'s siblings have been diagnosed with ADHD, are taking similar medications, and have been granted SSI benefits. (Dkt. No. 15).  Plaintiff argues that since her other two sons show behavior similar to D.S., and since they are receiving SSI benefits, D.S. should also be receiving those benefits.  First, this argument is misplaced since the other two sons records are not part of this case, and their conditions are not relevant to this application.  The court may only consider the evidence of record pertaining to D.S.

---

[5] *See Pollard v. Halter*, 377 F.3d 183, 193-94 (2d Cir. 2004).  In *Pollard*, the court held that although the new evidence consisted of documents generated after the ALJ's decision, it did not necessarily mean that they had no bearing on the Commissioner's evaluation of plaintiff's claim. *Id.*

14

In any event, the record shows that Ms. Sivers stated herself that D.S. had been on medication, while another son was not on medication. (T. 288, 289). This may very well account for the difference in her sons' behavior, however her other sons' behavior is not relevant to the behavior of D.S. The fact that medication improves D.S.'s behavior supports a finding that D.S. is not disabled. Additionally, the court notes, notwithstanding the irrelevance of this information, evidence that plaintiff's other sons are receiving benefits is certainly not "new" because plaintiff was well aware of this at the time of plaintiff's application and before the ALJ issued his decision since one son appears to have been granted SSI in 2000 and the other son in 2002. Plaintiff in fact testified to this fact at D.S.'s administrative hearing, so the ALJ was also aware of this fact. (T. 288).

Because plaintiff was well aware of this information, there was no "good cause" for her failure to present it to the agency. In any event, the ALJ was also aware of this information because plaintiff testified to these facts at the hearing. (T. 288). Thus, the information is clearly cumulative and not "material" since plaintiff's testimony did not, and the official documents would not, have changed the ALJ's decision in D.S.'s case.

Finally, plaintiff submits a letter from a teacher, dated August 4, 2005. Once again, although this evidence is "new", the evidence is not "material" because it does not relate to the appropriate time period and does not indicate that D.S.'s has "marked" or "extreme" limitations in any of the appropriate domains, and states that D.S.'s medication improved his impulsiveness. Thus, this court cannot consider any of the evidence that is not contained in the record. Notwithstanding the lack of "new and material" evidence, this court still must determine whether the Commissioner's

15

decision, based on the evidence of record is supported by substantial evidence.

## 5.    **Substantial Evidence**

In addition to the "new" evidence submitted by plaintiff, she also submitted a copy of one of the medical reports that does appear in the transcript.  Plaintiff has highlighted portions of this document, and the court assumes that plaintiff is basing her argument that the ALJ erred on this medical report, claiming that this report shows that D.S. is entitled to SSI benefits.[6]

A review of the report cited by plaintiff shows that it is a physician's screening/admission evaluation dated January 29, 2002. (T. 106-113).  The doctor's "differential diagnosis" was ADHD and "oppositional defiant disorder," however, his "admitting diagnosis" was "ADHD, combined type" and asthma. (T. 111, 112).  The doctor stated in the mental status portion of the report that D.S. was well groomed, clean, neat, and cooperative. (T. 109).  The doctor noted that D.S. was also hyperactive, not able to sit still, and always moving, however, his speech was normal, and his thought processes were organized, logical, and coherent. (T. 109).

The doctor stated in another section of the report that D.S. "[h]as shown impulsive behavior" and "would strike at others [with] no apparent reason." (T. 110). The court notes that from this comment, it does not appear that the doctor actually observed this behavior by D.S.  The report also indicates that D.S. was "not able" to immediately recall, was not able to recall three objects after five minutes, but was able

---

[6] Because plaintiff is pro se, the court is attempting to determine every argument that she could be making on behalf of her son even if it is not clear from the papers.  The court has the duty in any event to review the record *de novo* for substantial evidence even if the plaintiff were represented. *See Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004)(court reviews the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standards).

to tell the doctor that he was four years old. (T. 111).  In a section of the report entitled "Psychosocial and Environmental Problems," the doctor noted only that D.S. had a "short attention span," and that this would pose an "[e]ducational problem." (T. 112).  The report does not relate D.S.'s limitations to the criteria of the regulations.  The court also notes that at the time of this evaluation, D.S. was not taking any medications. (T. 108).

The court cannot look at only *one* report to determine whether there is substantial evidence to support the ALJ's decision.  The court must review the *entire record*.  In the transcript, there are two evaluations by physicians, one in November 2001 and another in May of 2002. (T. 94-97, 134-137).  Both of these evaluations by medical doctors find that D.S. does *not* meet any listings, and each physician's analysis of D.S.'s function in the six domains falls well below the required level to constitute the functional equivalent of a listing.

The ALJ's decision analyzes the treatment by Broome County Developmental Services, (T. 15), and the Binghamton Psychiatric Center, (T. 15).  The ALJ analyzed the six specific domains as required by the regulations. (T. 16, 17).  The ALJ's analysis of the medical evidence in conjunction with the requirements of the behavioral domains is supported by substantial evidence in the record.

Plaintiff's treating physician, Dr. Azmat Saeed, has *not* expressed any opinion contrary to the treatment by the Broome County Developmental Services which had a multi-disciplinary team approach and issued a multi-disciplinary report. (T. 74-86).  The multi-disciplinary report included detailed testing of IQ, (T. 80), and cognitive skills, (T. 84).  Likewise, there is nothing in the treatment records of Binghamton Psychiatric Center which shows any extreme deficits or impairments in D.S.'s

behavior.

The record indicates that often the descriptions of D.S.'s behaviors do not match the actual testing and examinations.  On September 4, 2001, the multi-disciplinary team reported that although D.S. showed many signs of ADHD, his test results did not indicate a "clear picture" because he was very cooperative during the evaluation, did not "fidget" much and did "not appear to have test patterns that indicate ADHD." (T. 83).

On November 6, 2001, D.S.'s teacher reported that D.S. had adjusted well to classroom routine, was sharing and taking turns with some reminders, was easily understood, was forming friendships, and loved the computer. (T. 92).  Although plaintiff gave information to the New York State Disability Agency in April of 2002, (T. 265-66), stating that D.S. was "very aggressive and had trouble staying in control, the detailed notes of a physical therapist that concern the same time period of February 2002 to April 17, 2002 state that D.S. was "doing well at home as per his parents" and was "having less outbreaks of behavior." (T. 125).  In notes from February 26 and 28, 2002, the physical therapist stated that D.S. was on Aderall and had shown "marked improvement" in his behavior at home. (T. 125).  This inconsistency casts doubt on the reliability of plaintiff's statements about D.S.'s behavior.

In notes dated March 12 and 14, 2002 the physical therapist stated that D.S. showed an "increased ability to focus on the task and perform fine motor activities." (T. 125).  In notes dated April 2 and 4, 2002, the physical therapist stated that D.S. was "showing large improvements in his turn taking ability and respect for others." (T. 126).  D.S.'s teacher in the 2003-2004 school year completed a questionnaire sent to her by the ALJ. (T. 142-44).  In her answers to the ALJ's questions, the teacher stated

that plaintiff exhibited "age appropriate" skills in learning or acquiring information. (T. 142). This included thinking, using language to express himself, whether it be in following directions, requesting information, or explaining something. (T. 142). The teacher did state that D.S. struggled with transition times and less structured activities and hurried through assignments. (T. 143). He responded negatively to criticism and became angry, defensive, and defiant with both peers and adults. (T. 143).

The teacher also noted that although D.S. could be unsafe and impulsive, "overall" he followed school rules. (T. 143). Although it was clear that D.S. had some limitations, his teacher also stated that D.S. was "very bright" and enjoyed school. (T. 143). The teacher also noted that there were times when D.S.'s medication was being changed that he would be very hyperactive, but at the time that she completed the form in January of 2003, D.S. was showing "little hyperactivity." (T. 144).

In a psychiatric report dated November 14, 2002, the notes stated that D.S. was "much calmer at home and at school." (T. 152). The reviewer noted that D.S. was doing well in school, both academically and behaviorally. (T. 152). In fact, plaintiff told the reviewer that D.S.'s teacher stated that D.S. was "the smartest child in her class." (T. 152).

As stated above, the ALJ assessed every domain individually, finding that D.S. has no limitations in acquiring and using information; "less than marked" limitations in attending and completing tasks, "less than marked" limitations in interacting and relating with others; no limitations in moving about and manipulating objects; "less than marked" limitations in caring for himself; and no limitations in health and physical well-being. (T. 16-17). In the analysis of each of these domains, the ALJ properly cites to reports that support his decision as to the extent of D.S.'s limitation

in each domain.  A review of the citations to the record show that the ALJ properly cited to reports supporting his decision.

It is not the function of this court to re-weigh the evidence or reverse the Commissioner as long as the decision is supported by substantial evidence in the record. *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).  Based on the evidence in the record, this court finds that the ALJ's determination is supported by substantial evidence.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 1, 2007

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge